UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA JOHNSON for her minor child, K.J., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No. 09 CV 4522** |
| MICHAEL J. ASTRUE, *Commissioner of Social Security*, | ) ) ) ) | **Magistrate Judge Young B. Kim** |
| Defendant. | ) | **September 30, 2010** |

**MEMORANDUM OPINION and ORDER**

Before the court are the parties' cross-motions for summary judgment. Plaintiff Angela Johnson ("Johnson") seeks supplemental security income ("SSI") child's benefits under the Social Security Act, 42 U.S.C. § 1382c(a)(3)(C), on behalf of K.J., her minor son. Johnson claims that K.J. is disabled by a combination of a learning disability, attention deficit hyperactivity disorder, behavior disorder, and depression. The Commissioner of Social Security issued a final decision denying her claims, and Johnson appeals. *See* 42 U.S.C. §§ 405(g), 1383(c). For the following reasons, Johnson's motion for summary judgment is denied and the Commissioner's motion is granted.

**Procedural History**

Johnson filed an application for SSI on K.J.'s behalf in November 2006, claiming that K.J. had become disabled on October 1, 2005. (A.R. 49.) After the Social Security Administration ("SSA") denied her claim initially and on reconsideration, (id. at 50-52, 56-59), Johnson was granted a hearing before an administrative law judge ("ALJ"), (id. at 23-

47). On December 29, 2008, the ALJ denied Johnson's claims. (Id. at 11-22.) The Appeals Council denied Johnson's request for review, (id. at 1-3), at which point the ALJ's decision became the final decision of the Commissioner, *see Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Johnson then filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Legal Framework

The social security disability benefit program allows low-income parents of disabled children to access benefits designed for disabled workers—the rationale being that parenting a disabled child "may limit the amount of productive work that the parents can do, inflicting hardship on families of limited means." *Sanchez v. Barnhart*, 467 F.3d 1081, 1082 (7th Cir. 2006). A child is considered disabled if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i).

Because "disabled children generally do not have a work history," their SSI claims are considered under a framework distinct from that used for adults. *Sanchez*, 467 F.3d at1082. The first two steps are the same: the ALJ asks whether the child is engaged in substantial gainful activity (if so, the claim is denied) and whether he has a medically severe impairment or combination of impairments (if not, the claim is denied). *See* 20 C.F.R. § 416.924;

2

*Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007). Next, the ALJ asks whether the child's impairment meets, or is medically or functionally equal to, one of the listings set forth in 20 C.F.R. § 404, Subpart P, Appendix 1. *See Murphy*, 496 F.3d at 633. To determine whether an impairment functionally equals a listing, the ALJ evaluates the severity of its impact in six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R.§ 416.926a(a), (b)(1). Functional equivalence exists where the ALJ finds that the child has a marked limitation "in two domains of functioning or an extreme limitation in one." *Murphy*, 496 F.3d at 633; 20 C.F.R. § 416.926a(a). A marked limitation interferes seriously—and an extreme limitation, "very seriously"—with a child's "ability to initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)-(3); *Patino v. Astrue*, 574 F. Supp. 2d 862, 869 (N.D. Ill. 2008).

## Facts

K.J. was born on August 7, 1994, and at the time of the hearing he was a 13 year-old eighth grader living in Joliet, Illinois with his mother, sister, and nephew. (Id. at 27, 30, 48.) K.J. had been diagnosed with depression, attention deficit hyperactivity disorder ("ADHD"), and a learning disability, and he had a long history of academic and behavioral problems.

### A. School and Psychological Records

K.J.'s school records from his seventh-grade year show that he was failing almost all of his classes. (A.R. 440-41.) K.J.'s teacher noted that his behavior in class was "horrible" and stated that his "behavior is affecting his grades." (Id. at 440.) In January 2007 K.J. was referred to Dr. John Brauer, a clinical psychologist, for a mental status examination. (A.R. 444-46.) Dr. Brauer noted that K.J. attended weekly counseling at the Will County Health Department to address his behavioral issues and took medications for depression and ADHD. (Id. at 444.) Dr. Brauer noted that K.J.'s hygiene, vocabulary, and "general fund of knowledge" were "poor," and his reading level was "quite poor." (Id. at 445-46.) Dr. Bauer conducted psychological tests that showed K.J. to be "in the low average range of cognitive functioning." (Id. at 446.)

In February 2007 K.J. underwent a psychological assessment with Karen Smith at the Will County Health Department. Smith interviewed Johnson, who reported that K.J. hides dirty dishes and garbage around their home and had been wetting the bed for about two years. (A.R. 531.) Johnson reported that K.J. does not necessarily shower on a daily basis and has an ongoing hygiene problem. (Id. at 532-33.) K.J. told Smith that when he is in trouble or when people yell at him he had transient thoughts of suicide, but denied ever trying to hurt himself. (Id. at 533.) Smith administered cognitive tests which showed that K.J. has a low-average IQ and below grade-level skills in a number of academic subjects. (Id. at 534-35.) She noted that K.J.'s "deficits in academics likely reflect years of inattention." (Id. at 537.)

4

She predicted that his academics would advance with special education services and that his behavior should improve "once he is placed in the correct academic environment." (Id. at 538.)

The following month, in March 2007, K.J. underwent school evaluations for special education classes. (A.R. 138, 152.) A school psychologist evaluated K.J.'s academic skills as being in the low-average range, with "very low" skills in reading and writing, and almost no phonetic awareness skills. (Id. at 144.) She estimated that his reading and writing skills were up to five years delayed. (Id.) A school social worker noted that K.J. is popular with his classmates, personable, and "can be respectful and polite." (Id. at 141.) She noted that he often disrupts his classes by "attempting to amuse his peers," and that he "appears to have little self control" in class. (Id.) The social worker also observed that K.J. argues with his teachers before the start of a new lesson and would then "shut down" and "refuse to work." (Id.) She said that K.J. "appears to be fearful of failure" and his lack of preparation and organization was of increasing concern. (Id.) She noted that K.J. had twelve office referrals and five suspensions for disciplinary infractions. (Id.)

Based on these evaluations, K.J. was placed in special education classes for the first time. (Id. at 138, 532.) A year later, his grades had improved significantly. In the first two quarters of the 2007-2008 academic year, K.J. had earned 3.38 and 3.25 grade-point averages, respectively. (Id. at 317.)

The record includes reports from three state agency reviewers who evaluated K.J.'s limitations in each of the six domains of functioning. In February 2007 two reviewers signed an evaluation opining that K.J. has no marked or extreme limitations in any of the functional domains. (A.R. 448-50.) They noted that K.J. "does not have significant mental health issues" but "appears to have some limitations in academic performance." (Id. at 452.) Three months later a third reviewer opined that K.J. has a marked limitation in attending and completing tasks, but less than a marked limitation or no limitation in the remaining domains. (Id. at 511.)

The record also conveys several incidents of K.J.'s troubling behavior. During the winter break of his seventh-grade year, K.J. ran away from home twice. Both times he was gone for only a day, turning up first at his grandmother's house and then at a friend's apartment, but Johnson was concerned enough to alert the police. (A.R. 573, 575.) Two months later, K.J. was hospitalized for a night after he threatened suicide during an argument with his mother. (A.R. 123, 486-87.) He later told his psychiatrist that he had not actually been suicidal, but rather was acting out because he was angry at his mother. (A.R. 499.) K.J. reiterated that explanation at the hearing. (Id. at 43.) That summer K.J. stole his mother's credit card and an acquaintance's bike and told his therapist that he felt no remorse for his misconduct. (Id. at 563, 565.) In September 2007 K.J. was caught smoking marijuana and he later reported to his therapist that he and a friend had consumed alcohol on the school bus. (Id. at 549, 561.) Finally, in April 2008, K.J. was expelled from school for pushing a teacher.

(Id. at 300, 330). As a result he was transferred to Thompson Instructional Center, an alternative school for children with behavioral problems. (Id. at 27, 46.)

**B.     K.J.'s and Johnson's Testimony**

At the hearing the ALJ asked K.J. to describe his typical day. He said that he gets up at 5 a.m. to take his medicine, then goes back to sleep until 6 a.m., when he gets ready for school and watches tv. (A.R. 35.) K.J. said that as an eighth grader at Thompson, he was attending regular classrooms for math and social studies but special education classes for his remaining academic courses. (Id. at 32.) He testified that his teachers give him extra time to take tests and read the questions out loud for him. (Id.) K.J. said that after school he takes the bus home and then watches tv and goes outside or to a friend's house until about 6:30 p.m., when he comes home to eat, watch tv, and get on the computer, where he spends time on myspace.com or listens to music online. (Id. at 36, 42.) Then he talks on the phone and goes to bed at 10:30 p.m. (Id. at 36.) K.J. said that he does chores, likes playing football and basketball, and spends time with friends every day. (Id. at 37-38.)

When asked about his relationships, K.J. testified that he sometimes has trouble getting along with people. (A.R. 38.) He also said that he has difficulty concentrating at school and that he stops working when it gets too difficult. (Id. at 39.) K.J. testified that before moving to Thompson, he often got in trouble for talking back, arguing with teachers, and failing to do his work. (Id. at 41.) He said he did those things because he "didn't get the

7

work." (Id.) When asked why he threatened to hurt himself in March 2007, K.J. testified that he "was angry," and that he had not "done anything like that since." (Id. at 43.)

Johnson testified that she believes that K.J. is disabled because he "doesn't have a lot of patience to keep up," and "he gives up easy, fast, and I don't see him doing a lot of positive things." (A.R. 33.) She said that K.J. has difficulty concentrating and that she constantly reminds him to clean up after himself. (Id. at 39.) She said that he does not wash his clothes regularly and that he requires constant reminders to maintain his hygiene. (Id. at 44.) Johnson testified that she does not believe that her son is truly depressed and does not believe that depression was behind his March 2007 suicide gesture. (Id. at 34.) She explained that K.J. had been seeing a psychiatrist at the Will County Health Department on a weekly basis for about two years and she believed that the medication that he prescribed were helping her son. (Id. at 34-35.)

C. ALJ's Decision

In denying Johnson's application for child disability benefits, the ALJ found that K.J. had not engaged in substantial gainful activity and that he had severe impairments in the form of learning problems, ADHD, behavior disorder, and depression. (A.R. 14.) The ALJ next determined that none of K.J.'s impairments—either individually or in combination—meet, equal, or functionally equal the listings. (Id.) In analyzing whether K.J.'s impairments functionally equal the listings, the ALJ found that he has no extreme limitations in any of the six domains of function. (Id. at 15-21.) The ALJ determined that K.J. has a marked

limitation in attending and completing tasks, but no limitation or less than a marked limitation in the remaining domains. (Id.) Accordingly, the ALJ concluded that K.J. is not disabled. (Id. at 21-22.)

**Analysis**

In challenging the Commissioner's decision denying K.J. benefits, Johnson argues that the ALJ erroneously overlooked or down-played evidence which would support a finding that K.J. has marked limitations in the domains of acquiring and using information, interacting and relating with others, and caring for oneself. Although the Commissioner received two extensions of time to file a responding brief and then sought (and received) leave to file its brief two days late, the response does little more than highlight a few facts meant to show that K.J.'s behavioral and academic problems were improving by the time of the hearing. Despite that unsatisfying response, the Commissioner benefits here from the applicable standard of review, under which this court upholds the Commissioner's decision as long as "it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); *Patino*, 574 F. Supp. 2d at 868. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In reviewing the Commissioner's decision for substantial evidence this court will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000). Instead, this court will uphold the Commissioner's decision if the ALJ builds an accurate and logical bridge from the evidence to the conclusion. *See Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007).

Johnson first argues that the ALJ's finding that K.J. has less than a marked limitation in acquiring and using information lacks the support of substantial evidence. According to Johnson, the ALJ failed to consider the special education services and other accommodations that K.J.'s school made for him, did not account for the evidence showing that K.J.'s academics were years below grade level, and selectively drew evidence favorable to his conclusions from Dr. Brauer's disability evaluation and Smith's psychological assessment. Although it is true that an ALJ may not overlook whole lines of evidence or "cherry-pick" evidence from the record that supports his conclusions, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), that is not what happened here. The ALJ discussed the results of K.J.'s cognitive testing and acknowledged that his IQ placed him in the low-average range. (A.R. 16.) The ALJ noted that K.J. was reading only at a second-grade level as of the winter of 2007. (Id.) The ALJ pointed out that Smith believed that he would improve academically with special education services and that one of his teachers believed that his achievement lags could be pinned on K.J.'s lack of desire rather than his lack of ability. (Id.) The ALJ went on to discuss at length K.J.'s subsequent grades in his special education classes and observed that by February 2008 K.J. was placed on his school's high honor roll. (Id.)

Contrary to Johnson's argument, the ALJ specifically acknowledged K.J.'s testimony that his teachers accommodate him by reading tests to him and giving him extra time. (Id.)

Johnson's argument that the ALJ "cherry-picked" evidence from Dr. Brauer's and Karen Smith's report is unpersuasive. As to the former, Johnson argues that "[w]hile the ALJ stated that Dr. Brauer found K.J. to have a low reading level, Dr. Brauer's actual findings were that [K.J.]'s 'reading level is quite poor.'" (R. 21, Pl.'s Br. at 8 (quoting A.R. 446).) She does not say what relevant difference there is in this distinction, nor does this court see one. It is hard to view this argument as anything other than the kind of quibbling that the substantial evidence standard precludes. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (noting that court's role is to examine ALJ's decision for "fatal gaps or contradictions" rather than to nit-pick). As for the Smith assessment, Johnson acknowledges that the ALJ highlighted Smith's view of K.J.'s reading lag, but faults the ALJ for not mentioning K.J.'s spelling and math lags "and that K.J. was considerably behind where he should be in school." (R. 21, Pl.'s Br. at 9.) It is true that the ALJ did not specifically mention Smith's assessment of K.J.'s spelling and math lags, but his decision assures this court that he reviewed and considered Smith's full report. The ALJ pointed out Smith's opinion that K.J.'s scores in those areas would likely improve with special education services, and then relied on the evidence showing that Smith's prediction was right—K.J. began receiving A's in math just months after his special-education assessment. (A.R. 16.) What's more, the ALJ reasonably relied on the fact that no treating professional had found

K.J. to have a marked or extreme limitation in this domain. (Id.) Because the ALJ adequately explained how this evidence supports his conclusion that K.J.'s limitation in acquiring and using information is less than marked, his conclusion has to stand. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (stating that ALJ need not "provide a written evaluation of every piece of evidence" as long as satisfies "minimal duty to articulate his reasons").

Next Johnson argues that the ALJ "made significant oversights" in concluding that K.J. has less than a marked limitation in interacting and relating with others, and argues that his decision on this point "does not reflect careful consideration of the record as a whole." (R. 21, Pl.'s Br. at 12.) Specifically, Johnson argues that the ALJ failed to consider K.J.'s persistent disrespect for his teachers—culminating in the teacher-shoving incident—and his on-going efforts to disrupt class by amusing his classmates. But once again, Johnson mischaracterizes the ALJ's explanation. The ALJ did specifically reference K.J.'s tendency to disrupt his class and engage in horseplay at school, but he thought that evidence outweighed by the evidence that K.J. is able to make and keep friends and spends a lot of time socializing. (A.R. 19.) And although it is true that the ALJ did not discuss K.J.'s expulsion in this section (he discussed it instead in the previous section finding that K.J. had marked impulse control problems), the ALJ specifically noted K.J.'s tendency to argue with his teachers and referenced K.J.'s multiple suspensions for disrespecting his teachers and failing to follow directions. (Id. at 18-19.) After noting that the social worker thought that

K.J. can also be personable, respectful, and polite and that K.J.'s family thought his behavior was improving, the ALJ reasonably concluded that his treatment of teachers was not caused by a functional limitation in interacting and relating to others. (Id.) At bottom, Johnson's argument with respect to the ALJ's findings in this domain is not so much that the ALJ improperly overlooked evidence helpful to K.J., but rather that the ALJ did not weigh the evidence as she would have preferred. But it is not this court's role to reweigh the evidence or second-guess the ALJ's judgment, but instead to ensure it is supported by substantial evidence. *See Clifford*, 227 F.3d at 869. Because the ALJ's decision provides that assurance here, his determination that K.J. has less than a marked limitation in the domain of interacting and relating to others must stand.

Finally, Johnson argues that in deciding that K.J. has no limitation in the domain of self-care, the ALJ made "omissions of pertinent evidence." (R. 21, Pl.'s Br. at 15.) Putting aside the questionable phrasing of this argument—after all, the ALJ is not required to include in his decision every scrap of pertinent evidence, *see Denton*, 596 F.3d at 425; *Rice*, 384 F.3d at 371—this court finds no reversible error in the ALJ's decision in this domain. Johnson's argument takes two forms. First, Johnson argues that the ALJ erroneously emphasized K.J.'s physical ability to bathe, dress, and groom himself when the relevant question is whether he does these things regularly in order to maintain a healthy physical and emotional state. She points out that more than one observer noted K.J. has a hygiene problem, that she constantly must remind him to clean his clothes and shower, and that there is evidence that K.J. had a

13

habit of hiding garbage and wetting the bed. Johnson argues that the ALJ committed reversible error in failing to address those problems.

Johnson is correct that the first sentence of the ALJ's analysis in this domain suggests that he focused on K.J.'s physical ability to bathe and groom himself. But the remainder of the discussion shows that the ALJ considered the regularity with which K.J. performed these tasks. The ALJ noted that K.J. regularly takes his medication, does chores, and gets himself to and from school. (A.R. 20.) He mentioned Johnson's testimony that she has to remind K.J. to shower and clean his clothes, which assures the court that the ALJ considered the evidence that K.J. had a mild hygiene problem. (Id.) (And in any event, Johnson points to no evidence suggesting that K.J.'s showering and laundry habits were outside the scope of normal behavior for a boy in early adolescence.) It is more troubling that the ALJ did not discuss K.J.'s bed-wetting in this domain, but the oversight does not constitute reversible error. Johnson reported to Smith in February 2007 that K.J. had been wetting the bed for two years. (A.R. 531.) Smith recommended that K.J. pursue treatment with a physician. (Id. at 537-38.) Johnson points to no evidence showing whether she followed up on that recommendation; nor is there evidence that the problem persisted at the time of the hearing. (Id. at 29.) Accordingly, to the extent the ALJ erred in overlooking K.J.'s bed-wetting issue, that error was harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003).

The second part of Johnson's argument with respect to this domain is her contention that the ALJ insufficiently dealt with K.J.'s difficulties in controlling his emotions. Johnson

faults the ALJ for not analyzing K.J.'s suicide threat in this domain and for failing to discuss the catalogue of behavioral incidents that Johnson recounts in her brief (including the run-away attempts, the stealing incident, and the marijuana and alcohol incidents). As for K.J.'s suicide threat, the record supports the ALJ's decision to analyze that incident under the domain of relating and interacting with others. K.J.'s psychiatrist, Johnson, and K.J. himself reported that he did not intend to hurt himself, but rather made the threat because he was angry at his mother. (A.R. 34, 43, 499.) Because there is evidence supporting the ALJ's interpretation of K.J.'s suicide threat as an act of angry retaliation toward his mother rather than a suicidal ideation, the ALJ reasonably discussed it in the previous domain. And to the extent that Karen Smith noted in 2007 that K.J. reported having on-going suicidal ideations before that incident, Social Security Ruling 09-7P states that even suicidal gestures "do not necessarily describe a 'marked' or an 'extreme' limitation" in the domain of self-care. *See* 2009 WL 396029, at \*6. Moreover, the most recent notes from K.J.'s therapist showed that as of May 2008 he reported having no thoughts of suicide. (A.R. 546.) Accordingly, to the extent that the ALJ erred in failing to analyze K.J.'s past suicidal thoughts in the domain of self-care, once again the error is not grounds for reversal.

As for Johnson's attempt to link K.J.'s behavioral difficulties to a marked limitation in the domain of self-care, the regulations pertaining to self-care emphasize the need for a child to use "effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions." 20 C.F.R. § 416.926a(k)(1)(iii). For adolescents,

15

the regulations contemplate that the child "should begin to discover appropriate ways to express your feelings, both good and bad." *Id.* § 416.926a(k)(2)(v). In other words, the regulations recognize that adolescents are works in progress; they are not expected to consistently express their emotions in appropriate ways. Again, the court finds the ALJ's decision not to analyze K.J.'s behavioral problems in this section questionable, but Johnson has cited no cases or other authority to show that isolated incidents of running away, stealing, and substance experimentation fall outside the normal range of early adolescent behavior. When asked why she believes K.J. is disabled, Johnson said nothing about his ability to care for himself. (A.R. 33.) And as the ALJ pointed out, not a single state agency evaluator opined that K.J. has any limitation—even one that is "less than marked"—in this domain. For these reasons, the court concludes that the ALJ's finding that K.J. has no limitation in this domain is supported by substantial evidence. *See Steele*, 290 F.3d at 940.

## Conclusion

Although there can be no doubt from any review of this record that K.J. has serious behavioral problems and faces substantial academic challenges, the ALJ sufficiently tied his conclusion that those challenges are not disabling to substantial evidence in the record. As the Seventh Circuit has pointed out, a child may have a turbulent adolescence, a low-average IQ, problems with concentration, and poor grades in some classes, but still be "able to function more or less adequately in school, so that if he were deemed disabled so would millions of other children be." *Keys*, 347 F.3d at 994. The ALJ adequately explained that

such is the case with K.J., and accordingly, the denial of benefits must stand. *See id.* For the foregoing reasons, Johnson's motion for summary judgment is denied, the Commissioner's is granted, and the decision of the ALJ is affirmed.

                                               **ENTER:**

                                               */s/ Young B. Kim*
                                               _____
                                               **Young B. Kim**
                                               **United States Magistrate Judge**